# COURT OF APPEALS OF WISCONSIN
## PUBLISHED OPINION

Case No.:             2021AP1787-FT

†Petition for Review filed

Complete Title of Case:

**ALLEN GAHL ATTORNEY IN FACT, ON BEHALF OF HIS PRINCIPAL, JOHN J. ZINGSHEIM,**

      **PETITIONER-RESPONDENT,†**

  **V.**

**AURORA HEALTH CARE, INC. D/B/A AURORA MEDICAL CENTER - SUMMIT,**

      **RESPONDENT-APPELLANT.**

| | |
|---|---|
| Opinion Filed: | May 25, 2022 |
| Submitted on Briefs: | January 25, 2022 |
| Oral Argument: | |

| | |
|---|---|
| JUDGES: | Neubauer, Grogan and Kornblum, JJ. |
| Concurred: | |
| Dissented: | Grogan, J. |

| | |
|---|---|
| Appellant ATTORNEYS: | On behalf of the respondent-appellant, the cause was submitted on the briefs of *Jason J. Franckowiak* of *Otjen Law Firm, S.C.*, Waukesha. |
| Respondent ATTORNEYS: | On behalf of the petitioner-respondent, the cause was submitted on the brief of *Karen L. Mueller* of *Amos Center for Justice & Liberty*, Chippewa Falls. |

# COURT OF APPEALS
## DECISION
## DATED AND FILED

## May 25, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2021AP1787-FT**

STATE OF WISCONSIN

Cir. Ct. No. 2021CV1469

IN COURT OF APPEALS

---

ALLEN GAHL ATTORNEY IN FACT, ON BEHALF OF HIS PRINCIPAL, JOHN J. ZINGSHEIM,

PETITIONER-RESPONDENT,

V.

AURORA HEALTH CARE, INC. D/B/A AURORA MEDICAL CENTER -

SUMMIT,

RESPONDENT-APPELLANT.

---

APPEAL from an order of the circuit court for Waukesha County: LLOYD CARTER, Judge. *Reversed*.

Before Neubauer, Grogan and Kornblum, JJ.

¶1 KORNBLUM, J. Aurora Health Care, Inc. appeals from a circuit court order granting an injunction compelling Aurora to administer a treatment

related to the COVID-19[1] pandemic.[2]  The request for the injunction came from patient John Zingsheim's health care representative, Allen Gahl.  Aurora contends that there is no legal authority for the court's order compelling a private healthcare provider to administer a treatment that the provider, in its professional judgment, has determined to be below the standard of care.  Aurora further contends that the court erred in compelling administration of the treatment when Gahl failed to show that he was entitled to a temporary injunction.  We agree.  Requests for injunctive relief must be premised on the existence of a viable legal claim upon which the petitioner can show a reasonable likelihood of success.  Gahl fails to meet this foundational requirement.  He has failed to identify any source of Wisconsin law that gives a patient or a patient's agent the right to force a private health care provider to administer a particular treatment that the health care provider concludes is below the standard of care.  Because Gahl has failed to identify any law, claim, or recognized cause of action under Wisconsin law by which a patient may compel a health care professional to administer a course of treatment contrary to that medical professional's judgment, the court erroneously exercised its discretion in granting Gahl injunctive relief.  We reverse.

---

[1] COVID-19 or COVID are the popular names for the SARS-Cov-2 virus.  Hereinafter, we will refer to the illness as COVID-19 or COVID.

[2] This court granted leave to appeal the order.  *See* WIS. STAT. RULE 809.50(3) (2019-20).  All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

## FACTUAL AND PROCEDURAL BACKGROUND[3]

*Gahl's Petition for Emergency Declaratory and Injunctive Relief*

¶2     Gahl holds the health care power of attorney (HCPOA) for his uncle, John Zingsheim (the patient), who is a patient in the Aurora hospital system. The patient had tested positive for COVID-19. Gahl filed what is titled a "Complaint for Emergency Declaratory and Injunctive Relief" on October 7, 2021.[4]

¶3     Based on his internet research, Gahl sought to compel Aurora to administer a medication called Ivermectin[5] (the proposed treatment) to the patient. Aurora filed its response on October 11, 2021. Both the petition and response included affidavits and exhibits, which will be discussed further below.

---

[3] Gahl's brief on appeal fails to comply with basic procedural rules. For example, his brief contains numerous factual assertions with no citations to the record, contrary to WIS. STAT. RULE 809.19(1) and (3)(a)2.

[4] Although entitled a "Complaint," the clerk's office labeled the document Gahl filed a "Petition." Throughout his appellate brief, Gahl refers to himself as "Petitioner-Respondent." The complaint does not contain a "case classification type and associated code number as approved by the director of state courts," as required by WIS. STAT. § 802.04(1). Throughout the proceedings, the initiating document is referred to in some places as a "Complaint" and in others as a "Petition." Gahl's attorney introduced himself as attorney for petitioner. For ease of reference, and to make clear that the terms "petition" and "complaint" refer to the same document, we refer to the document that is at the heart of this opinion as a "petition." Aurora did not object to deficiencies in the complaint.

[5] According to James Holmberg, M.D., Chief Medical Officer at Aurora Medical Center—Summit, "Ivermectin is a drug primarily used as an anti-parasitic in farm animals or administered to humans for treatment of certain parasites and scabies, and there is significant controversy in the public sphere surrounding its use for patients diagnosed with COVID-19." We refer to Ivermectin as "the proposed treatment" because the issue is not about Ivermectin per se, but rather, whether there is legal authority to require a private healthcare provider to administer a treatment that the provider has determined, in its professional judgment, to be below the standard of care.

¶4      Gahl's petition alleges the following information.  The patient was in the intensive care unit (ICU) at Aurora Medical Center—Summit (the hospital).  According to the petition, the patient "came down with COVID-19 on September 16, 2021."[6]  He was admitted to the hospital on September 19, 2021, and was transferred to the ICU.  On October 3, 2021, he was intubated and placed on a ventilator.  The patient's condition then "deteriorated quickly."  The patient was offered and received other treatments, agreed to some, but declined to continue others.[7]

¶5      Gahl, "losing hope for [the patient's] survival," searched for "an alternative treatment" and became aware of the proposed treatment.[8]  Gahl supplied

---

[6] The patient was initially hospitalized at Aurora's Hartford, Wisconsin, location on September 16, 2021.  He presented with symptoms for seven days and tested positive for COVID-19.

[7] Nothing in the petition alleges or infers that Aurora withheld from the patient any treatments for COVID-19 that Aurora made available to other patients.  According to the allegations in the petition, "[t]he Hospital's treatment has largely been limited to general care and assistance with breathing."  The record shows that the patient received "a steroid, Solu-Medrol, Baricitinib with acyclovir prophylaxis.  The patient declined remdesivir."  He later experienced decompensation and was subsequently intubated.  "He developed a pneumothorax that required a chest tube."  The record is not clear as to the exact date of intubation.  Gahl's attorney puts the date at October 2 in one place and October 3 in another.  The exact date is not relevant, as both parties agree that the patient was intubated at some point after admission to the hospital.

[8] There is no evidence in the record that Gahl is a doctor or a medical professional of any kind.

information about the proposed treatment, which he contended would save the patient, in exhibits to the petition.[9]

¶6    Gahl stated that he "received a prescription for [the proposed treatment] from Dr. Edward Hagen, M.D." who "wrote the prescription based on a detailed discussion of [the patient's] condition with Mr. Gahl." Gahl explained that "[t]he prescription for [the proposed treatment] was filled and Mr. Gahl is ready to deliver the Treatment to the Hospital." The hospital staff refused, based on their conclusion that providing the medication would be below the standard of care. Gahl then filed the petition seeking: (1) preliminary and permanent injunctive relief requiring Aurora to administer the proposed treatment to the patient; (2) a declaration that Aurora "will honor Petitioner's wishes under the power of attorney respecting the medical treatment" of the patient; and (3) an order requiring Aurora "to honor Mr. Gahl's request for the immediate utilization of" the proposed treatment.

---

[9] While the petition was filed on October 7, 2021, Exhibits A through F in support of and referenced in the petition were filed on October 11, 2021, with permission of the circuit court. Those exhibits were as follows: Exhibit A, the HCPOA for the patient, naming Gahl as his health care agent; Exhibit B, the prescription for the proposed treatment signed by Edward Hagen, M.D., indicating that the patient's drug allergies were "unknown" and that the diagnosis code was "Z86.16"; Exhibit C, copies of articles Gahl alleged "show[]" the proposed treatment "to be effective against COVID-19"; Exhibit D, a press release from the American Medical Association, among other organizations, "strongly oppos[ing] the ordering, prescribing, or dispensing of [the proposed treatment] to prevent or treat COVID-19 outside of a clinical trial"; Exhibit E, a copy of an article from the Food and Drug Administration (FDA), titled "Why You Should Not Use [the proposed treatment] to Treat or Prevent COVID-19" (printed October 6, 2021); and Exhibit F, the same FDA article (printed September 3, 2021), which included language that "[t]he FDA has not reviewed data to support use of [the proposed treatment] in COVID-19 patients to treat or to prevent COVID-19," language that appeared to have been removed from the article at some point.

¶7    Gahl also filed a proposed order to show cause, with an affidavit averring the benefits of the proposed treatment.[10]  Gahl's affidavit makes several claims about these benefits,[11] based on newspaper articles and other information, purportedly from medical research, stating that patients who received the proposed treatment recovered.

¶8    None of the information Gahl included with his petition or with his first affidavit came directly from a medical professional.  Gahl's affidavit also discusses Hagen and his purported professional medical training.  He states that Hagen gained all of the information about the patient from discussions with Gahl, confirming that Hagen never met the patient or conferred with the patient's treating doctors prior to writing the prescription for the proposed treatment.  The affidavit is silent on whether Hagen reviewed the patient's medical records.  Importantly, Gahl initially did not submit an affidavit from Hagen or any other licensed medical

---

[10]  The record has duplicative labeling of various affidavits and exhibits.  Chronologically, the only affidavit that was filed with the petition was the affidavit of Gahl, which is "in support of the order to show cause for a temporary restraining order and a preliminary injunction."  This affidavit was filed on October 7, 2021.

[11]  At the court's invitation, Gahl later submitted several exhibits supporting his affidavit: (1) another copy of the POA; (2) pictures of the patient before he became ill; (3) copies of news articles about the proposed treatment; (4) copies of what are purported to be court orders from other states; and (5) "medical articles and studies" regarding the proposed treatment, filed in multiple parts, including papers obtained from an advocacy group for the proposed treatment, what appear to be unpublished papers, and what appear to be excerpts from arguments supporting the proposed treatment.

professional with the petition explaining why the proposed treatment was necessary for this patient or within the standard of care.[12]

*Aurora's Response*

¶9    Aurora opposed Gahl's petition, arguing that "[t]here is no legal authority in Wisconsin that would authorize a court to compel a licensed health care provider to render treatment or to administer a medication that the provider reasonably believes would be below the standard of care in light of the provider's medical education, training and experience." Further, Aurora argued that Gahl's submission and accompanying materials were insufficient to establish the criteria necessary to support a claim for temporary injunctive relief.

¶10    Aurora also observed that Hagen "was never a treating physician for" the patient, he "never periodically saw or examined the patient," and he "did not even have access to the patient's medical records." Further, there was no evidence presented that the dosage of the medication ordered by Hagen was "appropriate, therapeutic or even … safe for the patient to take" "under his present circumstances." Hagen was also "not credentialed" and "not privileged to treat patients at Aurora." In fact, Aurora raised its concern to the court that the Wisconsin State Licensing Board had previously disciplined Hagen for prescribing medications to a person who was not his patient and whom he had not examined.

---

[12] Neither Aurora nor Gahl defines the term "standard of care." Wisconsin law defines the "standard of care" as "the degree of care, skill, and judgment which reasonable (doctors who are in general practice) (specialists who practice the specialty which (doctor) practices) would exercise in the same or similar circumstances, having due regard for the state of medical science at the time (plaintiff) was (treated) (diagnosed)." WIS JI—CIVIL 1023. Failure to "exercise that degree of care and skill which is exercised by the average practitioner in the class to which he [or she] belongs, acting in the same or similar circumstances," constitutes medical negligence. *Shier v. Freedman*, 58 Wis. 2d 269, 283-84, 206 N.W.2d 166 (1973).

Aurora asked the circuit court to deny Gahl's request for emergency injunctive and declaratory relief.

¶11  In support of its position, Aurora filed affidavits from the patient's treatment providers. The affidavit of David Letzer, D.O., states that he is part of the patient's treatment team. He summarizes the scientific information about the proposed treatment and concludes that the opinion of the medical treatment team for the patient is that the proposed treatment is not appropriate and administering the proposed treatment would violate the standard of care. He asserts that neither he nor anyone else on the team is ethically obligated to provide a treatment that violates the standard of care. In addition, the proposed treatment may have adverse effects on the patient, including heart damage, liver damage, stroke, and kidney damage.

¶12  Likewise, the affidavit of James Holmberg, M.D., Chief Medical Officer of Aurora Medical Center—Summit, states that he is familiar with the patient, his condition, and the proposed treatment. He explained that the proposed treatment "can be dangerous to humans and cause hypotension, ataxia, seizures, coma, and even death." He avers that the proposed treatment is not part of any treatment protocols at Aurora and could cause heart, liver, and kidney damage as well as stroke. He also explained that guidance at that time from the medical community, including the U.S. Centers for Disease Control (CDC), the Food and Drug Administration (FDA), the American Medical Association (AMA), American Pharmacists Association, and American Society of Health-System Pharmacists, warned against the use of the proposed treatment to treat COVID-19. Thus, in his expert medical opinion, administering the proposed treatment "would be neither safe nor effective medical care and would deviate from the standard of care." In fact, providing the treatment would violate the standard of care. He too observed

that neither he nor any member of the staff is ethically obligated to provide treatment that deviates from the standard of care, and he expressed "distress" that a court would consider ordering a hospital to administer a treatment that is contrary to the FDA, CDC, and the patient's treatment team recommendations.

*October 12, 2021 Hearing*

¶13    The circuit court held a hearing on the petition on October 12, 2021. At the hearing, the court stated that it presumed the parties were "proceeding under [WIS. STAT. ch.] 813 the injunction—injunctive relief statute in Wisconsin." The court heard extensive arguments regarding the proposed treatment, acknowledged the requirements for temporary injunctive relief, and ultimately determined that it did not have sufficient information to make a final decision:

> I feel that I do need more information …. This is not a decision that a Court makes based on emotion. That's not appropriate. So I need evidence, and I—I want more evidence from the treating doctors as to what is [the patient's] current medical situation, what is his prognosis, what—what is proposed to move forward. Is there something proposed to move forward, or is this a wait-and-see situation with no other alternatives?
>
> And I'd like some more information to—to create that connection between this Dr. Hagen prescription and [the patient], because what I'm seeing here is just—there's a prescription written by somebody who really has very limited information about [the patient] …. Other than Mr. Gahl, averring that he has communicated what the hospital has told him, again, there's no details of that …. It's Mr. Gahl's interpretation of what the hospital told him. And I don't know where that information comes from, so I don't know the viability of that information.
>
> But, you know, the ask here is for this Court to give a directive to some treating licensed medical doctors that they are telling me is contravening their responsibility to their patient. I mean, the divergent positions here couldn't be

9

> more extreme. And the consequences of action and nonaction are significant as well.

The court then allowed the parties additional time—until that afternoon—to supplement the record.

*Supplementing the Record*

¶14 Both Aurora and Gahl submitted supplemental affidavits to the circuit court. Gahl submitted three documents: a second affidavit from himself; an affidavit from Hagen; and a declaration from Pierre Kory, M.D., which was not dated or notarized. In his own affidavit, Gahl affirmed that Hagen never reviewed the patient's medical records. Hagen's information came solely from Gahl and his wife based on their observations of the patient.[13] According to Gahl, he and his wife completed a questionnaire "on an app," a print-out of which was included as an exhibit to Hagen's affidavit.

¶15 Hagen's affidavit confirmed that the medical history of the patient was based solely on the statements of Gahl's wife, and he wrote the prescription for the proposed treatment based on this information. Hagen gave a medical opinion, based on this third-party history without ever examining the patient, that "based on the patient's history … the administration of [the proposed treatment] at the dosage indicated, gave the patient a realistic chance for improvement while presenting a low risk of side effects." He stated that he has prescribed the proposed treatment "in about 300 other cases with generally favorable results and no serious cases of side effects from the drug."

---

[13] Gahl's hand-written, nearly illegible notes, which appear to relate to the patient, were attached to the affidavit.

¶16    Gahl also submitted a "declaration" from Kory. The "declaration" is an unsworn document explaining his support for the use of the proposed treatment for COVID-19 patients. The declaration is conspicuously devoid of any discussion of the patient in this case.[14] Kory's declaration states that he is "generally considered the foremost expert on [the proposed treatment] in the treatment of COVID-19 in the world" and that the proposed treatment "is extremely beneficial in treating COVID-19 and can substantially reduce the risks associated with COVID-19 and further substantially reduce the deaths patients face from being on a ventilator for a prolonged period of time."

¶17    In addition to Kory's declaration, Gahl also filed what is labeled "sworn" testimony of Kory from a homeland security committee meeting, where Kory discussed the benefits of the proposed treatment for COVID-19. However, like the declaration, nothing in the document indicates that it is sworn "testimony" nor is it attached to an affidavit attesting to its authenticity.

---

[14] Kory included several exhibits with his declaration. As explained above, neither the declaration nor any of the exhibits is sworn. The exhibits are as follows: Exhibit A, a copy of a paper, authored by Kory and others, titled "Review of the Emerging Evidence Demonstrating the Efficacy of [the proposed treatment] in the Prophylaxis and Treatment of COVID-19"; Exhibit B, Kory's curriculum vitae; Exhibit C, a seventy-six-page document titled "[the proposed treatment] for COVID-19: real-time meta analysis of 65 studies"; Exhibit D, a table, which appears to be printed from the National Institutes of Health (NIH) website, titled "Table 2e. Characteristics of Antiviral Agents That Are Approved or Under Evaluation for the Treatment of COVID-19," listing the proposed treatment and that it is "[g]enerally well tolerated"; Exhibit E, a document from the World Health Organization (WHO) Collaborating Center for International Drug Monitoring listing the adverse drug reactions from a different drug used to treat COVID-19; Exhibit F, a similar document listing the adverse drug reactions for the proposed treatment, which shows no deaths; Exhibit G, an article titled "India's [proposed treatment] Blackout: The Secret Revealed," which indicated that patients in India were given the proposed treatment and they recovered from COVID-19; and Exhibit H, a copy of a "legal notice" from the Indian Bar Association, which Kory explained is a lawsuit against the chief scientist of the WHO "for spreading false information about the efficacy of [the proposed treatment]."

¶18    None of the documents Gahl filed relating to Kory establish that Kory ever examined this patient or spoke with this patient's treating medical providers. The documents also do not establish what the appropriate dosage of the proposed treatment is for a patient in this patient's condition. At no time did Gahl submit any medical information from any health care professional who had actually examined this patient, reviewed this patient's records, or who could give a medical opinion to a reasonable degree of medical probability about the benefits of the proposed treatment on this patient at this time.

¶19    Aurora filed a supplemental affidavit from Holmberg, discussing, in detail, the treatment history and current treatment plan for the patient as of October 11, 2021. According to Holmberg's affidavit, to a "reasonable degree of medical probability," administration of the proposed treatment would have "no beneficial effect" for the patient. Holmberg continued to object to the hospital being forced to provide treatment that fell below the standard of care.

*Circuit Court's Order*

¶20    The circuit court acted on the parties' supplemental information immediately and signed an order the same day, on October 12, 2021, compelling Aurora to administer the proposed treatment to the patient. Specifically, the court ordered

> that pending further order of this Court, [Aurora], their agents, and assigns, and any third parties acting on its behalf, upon receipt of this Order to Show Cause and its supporting papers, shall immediately enforce Dr. Hagen's[] order and prescription to administer [the proposed treatment] to [the patient] and thereafter as further ordered by Mr. Gahl.

While the court cited the criteria for granting a temporary injunction at the hearing, the court never applied those criteria to the facts of the case on the record or in the

order. The court failed to identify which, if any, legal claim asserted by Gahl in the petition provided a basis for the injunctive relief requested, much less the legal authority supporting such a claim. The order also scheduled a show-cause hearing for October 13, 2021, directing Aurora to demonstrate why the order should not go into effect.

¶21 Later in the day on October 12, 2021, after the circuit court issued its order, Aurora filed a letter objecting to the order. Aurora's counsel explained that

> [t]he content of the signed Order is extremely problematic. I am not aware of any orders written by Dr. Hagen, but am aware of a prescription written by Dr. Hagen for [the proposed treatment] 66mg to be taken once daily. The prescription does not indicate from where [the proposed treatment] is to be obtained or how the tablets are to be administered to a patient who is intubated and sedated. Finally, the Order provides that Aurora is to administer [the proposed treatment] "as further ordered by Mr. Gahl." Mr. Gahl is not a healthcare provider.
>
> For the reasons above, it is my position as counsel for Aurora that my client is unable to comply with the terms of the Order as drafted.

Aurora also immediately petitioned this court for leave to appeal a nonfinal order.

*October 13, 2021 Hearing*

¶22 At the show-cause hearing on October 13, 2021,[15] the discussion focused on the current medical status of the patient and the advantages and disadvantages of the proposed treatment. Aurora advised the circuit court that the

---

[15] The circuit court was aware of the petition for leave to appeal a nonfinal order filed with this court, but because we had not yet acted on that petition, the court went ahead with the hearing on October 13, 2021.

13

patient had tested negative for COVID-19 and provided information indicating that the patient was improving:[16]

> [The patient] has been weaned off pressors, his parotitis has improved, his transaminitis is better, TPN has been discontinued, and he's on a feeding tube, he's gone from three chest tubes to one, his acute blood loss anemia is now stable. We provided Your Honor with a list of the medications and therapies that [the patient] is receiving.

Aurora pointed out that Holmberg had submitted a second affidavit showing the patient was improving and questioned why Gahl had not submitted any contradictory affidavits showing the patient was not improving.[17] Aurora was concerned that the medical information on which Hagen based his prescription was from October 1, 2021, which was thirteen days prior to this update. Aurora reiterated its objection to the court's order compelling it to provide treatment below the standard of care. Aurora again expressed concern that the court was requiring the medical providers to engage in unprofessional conduct by providing treatment that is below the standard of care. Confronted with the new information that the patient was no longer testing positive for COVID-19, Gahl's attorney switched his argument from using the proposed treatment as an emergency treatment for COVID-19 to giving the proposed treatment for "COVID and the damages that come about as a result of COVID."

¶23 For his part, Gahl's counsel put forth a number of anecdotal cases from other states, indicating that circuit courts had approved use of the proposed

---

[16] We note that the petition was filed in October 2021, and we are bound by the record before us. We are unaware of the current status of the patient. Neither Gahl nor Aurora has provided additional information.

[17] The circuit court stated that it did not know how to interpret the information submitted without hearing from Holmberg, whom Aurora's attorney introduced at the beginning of the hearing as being "with me today" and "appearing on the screen."

14

treatment. The circuit court did not view these anecdotes as persuasive, noting that they were "interesting" but were not material to the issues before the court. The court focused on the issues regarding this patient, whether to continue the order from the previous day, and if so, how to administer the treatment in practical terms.

¶24 After considering arguments and the entire record, the circuit court summarized its conclusions:

> As it stands right now, this Court entered an order that is subject to a petition for leave to appeal to the Court of Appeals, who have not weighed in on it. My intention is to maintain that order, but I am not going to engage in directing the hospital or individuals at the hospital of an individual to administer this medication to [the patient]. I think it's incumbent on [Gahl] to supply a medical professional that's approved by the hospital for purposes of assisting this patient. But I don't think it's appropriate for this Court to engage in further orders to the hospital as to how this drug is administered.
>
> They have, they being the hospital, have their rules of whom they admit to practice medicine there and how they do it, and I don't think—The Court is taking a significant step in this case by the order that's been entered. I think it's [Gahl's] responsibility for not only supplying the prescription but supplying an individual that meets the approval of the hospital for administration. If Dr. Hagen doesn't pass muster, then the petitioner has to find somebody else. But I don't think this Court—This Court does not feel comfortable in making any further directives or orders to the hospital as to how that's to occur. I think that's a responsibility of [Gahl] here and it's—That's how the Court views it.

The court did agree to a "clarification" of its previous order: Gahl was to "supply or identify a physician that [the hospital] can then review and pass through its credentialing process. And once credentialed, that physician … will have permission to enter upon [the hospital] and administer the [proposed treatment] as ordered by Dr. Hagen." At no point did the court issue an oral or written order

explaining whether or how Gahl had established the four criteria for injunctive relief. The court also did not identify any claim set forth in Gahl's petition which supported the request for relief, much less the legal authority supporting the claim.

*Aurora's Appeal*

¶25     On October 14, 2021, we granted Aurora's petition for leave to appeal a nonfinal order prior to Aurora's compliance with the circuit court's order.[18]  On our own motion, we also stayed the order and circuit court proceedings pending resolution of this appeal.

¶26     Six days later, on October 20, 2021, Gahl filed an emergency petition to bypass the court of appeals.  After allowing time for Aurora to respond, our supreme court denied the petition for bypass on October 25, 2021.[19]

---

[18] We also ordered that "[t]o the extent there have been any modifications to that order at the October 13, 2021 hearing, the parties may address the effect of those modifications in their appellate briefing."  The modified order from the October 13, 2021 hearing was not signed by the circuit court before we granted leave to appeal.  Aurora urges us to consider both the original order and the subsequent oral modification.  Aurora also argues that the amended order does not make the original order moot.  Gahl does not address this argument.  We independently reviewed the criteria for mootness and agree with Aurora that either the issue is not moot or that it meets two of the five criteria for reviewing an otherwise moot issue. *See* **Marathon County v. D.K.**, 2020 WI 8, ¶19, 390 Wis. 2d 50, 937 N.W.2d 901.  The issue is not moot because, if this court were to affirm the court below, the oral modification would have a practical effect on the controversy.  In addition, the issue is of great public importance, is likely to recur, and must be resolved to avoid uncertainty. *See* **id.**

[19] Pursuant to our supreme court's request for a status report, Aurora and Gahl advised that they engaged in negotiations and Aurora was on the cusp of providing temporary credentials to an outside provider, subject to Gahl signing releases.  However, once we issued the stay, the negotiations ceased.

**DISCUSSION**

¶27 The question before us is whether the circuit court had the legal authority to issue an injunction compelling Aurora, a private healthcare provider, to administer treatment that, in its professional judgment, is below the standard of care or to compel Aurora to credential a non-Aurora medical provider to administer the treatment.[20]

I. *Standard of Review*

¶28 A circuit court may issue a temporary injunction if the movant establishes four criteria: "(1) the movant is likely to suffer irreparable harm if a temporary injunction is not issued; (2) the movant has no other adequate remedy at law; (3) a temporary injunction is necessary to preserve the status quo; and (4) the movant has a reasonable probability of success on the merits." *Milwaukee Deputy Sheriffs' Ass'n v. Milwaukee County*, 2016 WI App 56, ¶20, 370 Wis. 2d 644, 883 N.W.2d 154. Whether to grant or deny injunctive relief is a matter of discretion for the circuit court. *Id.* (citing *State v. C. Spielvogel & Sons Excavating, Inc.*, 193 Wis. 2d 464, 479, 535 N.W.2d 28 (Ct. App. 1995)).

¶29 A circuit court's exercise of discretion will be upheld if it "examined the relevant facts, applied a proper standard of law, and using a demonstrative rational process, reached a conclusion that a reasonable judge could reach." *Lane v. Sharp Packaging Sys., Inc.*, 2002 WI 28, ¶19, 251 Wis. 2d 68, 640 N.W.2d 788. "[W]hen the contention is that the [circuit] court erroneously exercised its discretion

---

[20] Gahl agrees that this is the issue. In his brief, he states that "[t]he issue before the court of appeals is whether a circuit court has the authority to compel a health care provider to administer a medical treatment that the medical health care system asserts fell below its 'professional standard of care' regarding Patient Safety. The circuit court's actions said it did have that authority."

because it applied an incorrect legal standard, we review that issue of law de novo." *Hughes v. Hughes*, 223 Wis. 2d 111, 120, 588 N.W.2d 346 (Ct. App. 1998). A circuit court erroneously exercises its discretion if it grants temporary injunctive relief on the basis of a pleading that fails to state a viable legal claim. *School Dist. of Slinger v. Wisconsin Interscholastic Athletic Ass'n*, 210 Wis. 2d 365, 374, 563 N.W.2d 585 (Ct. App. 1997).

> *II.    Reasonable Probability of Success on the Merits*

¶30    We first discuss whether Gahl has a reasonable probability of success on the merits. *See Milwaukee Deputy Sheriffs' Ass'n*, 370 Wis. 2d 644, ¶20. A complaint stating at least one viable legal claim is required as an underlying basis for an injunction. *School Dist. of Slinger*, 210 Wis. 2d at 374. In other words, there must be a viable or protectable legal claim (or right) upon which Gahl would have a reasonable probability of success. A request for a temporary injunction is not a claim in and of itself, but a vehicle to prevent harm while litigation is pending on the underlying claim(s). A temporary injunction is available

> *[w]hen it appears from a party's pleading that the party is entitled to judgment* and any part thereof consists in restraining some act, the commission or continuance of which during the litigation would injure the party, or when during the litigation it shall appear that a party is doing or threatens or is about to do, or is procuring or suffering some act to be done in violation of the rights of another party and tending to render the judgment ineffectual, a temporary injunction may be granted to restrain such act.

WIS. STAT. § 813.02(1)(a) (emphasis added).

¶31    We look to Gahl's petition to find at least one viable legal claim, or protectable legal right, that would entitle him to a judgment in the litigation. *See School Dist. of Slinger*, 210 Wis. 2d at 374. In his petition, Gahl includes two

sections that he terms "causes of action." One is for injunctive relief; the other is for declaratory judgment. Wisconsin's declaratory judgment statute allows courts "to declare rights, status, and other legal relations whether or not further relief is or could be claimed." WIS. STAT. § 806.04(1). This includes the power to declare the rights of parties pursuant to a contract or statute. Sec. 806.04(2).

¶32 The "rights" upon which Gahl seeks declaratory relief (and which allegedly support the request for temporary injunctive relief pending litigation on the merits) are difficult to identify and not well developed. Nevertheless, Gahl posits a few sparsely identified potential legal theories, or rights, supporting his request for a declaratory judgment at various places within the petition. But the circuit court never addressed any of these legal theories in any written order or at the October 12 and October 13 hearings. In failing to identify a viable legal claim supporting a declaratory judgment and setting forth reasoned analysis as to why Gahl had a reasonable probability of success on it, the court erred by plowing ahead and granting temporary relief on the basis of these pleadings.

¶33 Both parties agree that the issue presented is whether the circuit court had authority to compel Aurora to administer a treatment that, in its professional judgment, is below the standard of care. Gahl contends that the circuit court had such authority. Aurora disagrees. Aurora presented affidavits and accompanying exhibits demonstrating that the proposed treatment is below the standard of care for this patient. Nowhere does Gahl present affidavits from health care providers showing that the proposed treatment is within the *accepted* standard of care for COVID-19. Rather, throughout his brief, Gahl effectively acknowledges that the proposed treatment is not within the accepted standard of care for

COVID-19. He admits that using the proposed treatment for COVID-19 is not approved by the FDA, as it is an "off-label use of the drug."[21]

¶34　Instead, Gahl attacks the standard of care as politically and financially motivated, "a 'one-size fits all' Covid-19 Protocol encouraged by the National Institute of Health (NIH) and the Centers for Medicare and Medicaid (CMS) through an intense propaganda campaign and the use of financial incentives/rewards for using some select drugs and by prohibiting the use of other drugs such as [the proposed treatment]." Gahl presents no evidence to support these assertions. He presents no affidavits from medical doctors saying that the proposed treatment is

---

[21] According to the FDA website,

> Unapproved use of an approved drug is often called "off-label" use. This term can mean that the drug is:
>
> - Used for a disease or medical condition that it is not approved to treat, such as when a chemotherapy is approved to treat one type of cancer, but healthcare providers use it to treat a different type of cancer.
>
> - Given in a different way, such as when a drug is approved as a capsule, but it is given instead in an oral solution.
>
> - Given in a different dose, such as when a drug is approved at a dose of one tablet every day, but a patient is told by their healthcare provider to take two tablets every day.
>
> If you and your healthcare provider decide to use an approved drug for an unapproved use to treat your disease or medical condition, remember that FDA has not determined that the drug is safe and effective for the unapproved use.

U.S. FOOD & DRUG ADMIN., UNDERSTANDING UNAPPROVED USE OF APPROVED DRUGS "OFF LABEL" (Feb. 5, 2018), https://www.fda.gov/patients/learn-about-expanded-access-and-other-treatment-options/understanding-unapproved-use-approved-drugs-label#:~:text=Unapproved%20use%20of%20an%20approved,a%20different%20type%20of%20cancer.

within the *accepted* standard of care for COVID-19. At most, the information he presents suggests that the court should adopt a standard of care different from that which is described by Aurora. We do not decide the medical question of what the standard of care should be. We are not doctors. We decide the legal question, as both Aurora and Gahl agree, of whether the court has the authority to order Aurora to provide treatment that is below the currently accepted standard of care for COVID-19. In other words, we must determine whether Gahl has identified any law, claim, or recognized cause of action under Wisconsin law by which a patient may compel a health care professional to administer a course of treatment contrary to that medical professional's judgment.

¶35 Before the circuit court, Gahl raised several potential legal bases for the declaratory relief (and consequently, a temporary injunction).[22] On appeal, Gahl abandons most of his original arguments, so we will not consider them. *See A.O.*

---

[22] In his petition, the only argument that Gahl made regarding "success on the merits" is that "the evidence in favor of the Treatment is considerable, and the counterarguments against its use and efficacy are weak. Because the risks associated with the use of the Treatment are extremely low compared to the risks of non-administration, Petitioner is likely to prevail at trial." Success on the merits, for Gahl, is persuading the court to order the proposed treatment.

We have carefully scrutinized the petition to discern Gahl's probable arguments supporting his claim that the court has authority to act in this case. The arguments Gahl set forth in his original petition are as follows: (1) failure to provide the treatment violated the "Hippocratic Oath"; (2) withholding the proposed treatment violates the patient's right to self-determination under WIS. STAT. § 51.61(1)(fm), common law, and article I, sections 1 and 9 of the Wisconsin Constitution; (3) withholding treatment violates the HCPOA held by Gahl; (4) the patient had a right to participate in his plan of care; (5) "the public interest will be served by this decision as it is based solely on the best interest of the patient, the patient's right to self-determination with respect to his medical treatment, and which may be his last chance for a full recovery"; (6) withholding the proposed treatment is a violation of the Eighth Amendment prohibition against cruel and unusual punishment because the hospital has sole custody of the patient, which makes the hospital like a prison, and the patient's rights are therefore similar to a prisoner's right to treatment; and (7) Aurora should not be concerned about liability because the court order and "the express and implied waiver of liability by the patient's lawful representative" will absolve the hospital of liability. While Gahl mentioned Wisconsin's Right to Try Act in passing, Gahl conceded before the circuit court that the law does not apply in this situation.

21

*Smith Corp. v. Allstate Ins., Cos.*, 222 Wis. 2d 475, 491, 588 N.W.2d 285 (Ct. App. 1998) ("[A]n issue raised in the [circuit] court, but not raised on appeal, is deemed abandoned.").

¶36 On appeal, Gahl argues that the court's authority to grant declaratory judgment (and issue an injunction pending litigation on the merits) was based on one or more of the following: (1) authority derived from a statute concerning HCPOAs, WIS. STAT. § 155.30(1); (2) an implied contractual duty based on the Hippocratic Oath; (3) legal and equitable authority to compel a licensed health care provider to render medical treatment; and (4) patients' rights under WIS. STAT. § 448.30.

¶37 We consider the first three arguments but not the fourth because Gahl raised that argument for the first time on appeal. *See State v. Bustamante*, 201 Wis. 2d 562, 571, 549 N.W.2d 746 (Ct. App. 1996).

A. *Health Care Power of Attorney: WIS. STAT. § 155.30(1)*

¶38 Gahl argues that the HCPOA provides legal authority for the circuit court's ruling. Before the circuit court, he relied on the HCPOA form itself. On appeal, he expands his argument to include a statute in WIS. STAT. ch. 155, which governs HCPOAs. He argues that this statute, WIS. STAT. § 155.30(1), empowers courts to grant declaratory relief (and an injunction) ordering a health care provider to administer a specific treatment.[23] We do not agree.

---

[23] Aurora argues that this argument is raised for the first time on appeal. However, because this argument was made in some form before the circuit court, and Aurora addressed it at the hearing, we will address it on appeal.

¶39  WISCONSIN STAT. § 155.30(1) sets forth language that is required to be included in a Wisconsin HCPOA form "that is sold or otherwise distributed for use by an individual in this state who does not have the advice of legal counsel." The statutorily required language begins as follows:

> NOTICE TO PERSON MAKING THIS DOCUMENT
>
> YOU HAVE THE RIGHT TO MAKE DECISIONS ABOUT YOUR HEALTH CARE.  NO HEALTH CARE MAY BE GIVEN TO YOU OVER YOUR OBJECTION, AND NECESSARY HEALTH CARE MAY NOT BE STOPPED OR WITHHELD IF YOU OBJECT.

According to Gahl, the plain meaning of "necessary health care may not be stopped or withheld if you object" is that the patient has "a right to have necessary treatments or drugs such as [the proposed treatment] administered."  He argues that

> [t]he language found in the HCPOA form makes it clear that the person executing the HCPOA document has the power under the statute to receive the medical treatment that they request.  Implicit in this statement due to the nature of the document being created, is that the Principal not only can expect their "*NECESSARY*" treatment requests to be honored by medical professionals, but also that this power is transferred to their attorney-in-fact for health care.

¶40  Gahl cites no legal authority for his position, either regarding the form itself or the statute.  He asserts that the phrase "necessary health care may not be stopped or withheld if you object" is "clear and unambiguous," and "[t]he necessity of [the proposed treatment] is 'inescapable.'"  Further, according to Gahl, "[t]here is no good reason for 'withholding' the [proposed treatment] from [the patient] and WIS. STAT. § 155.30(1) forbids the hospital from doing so, once the patient or their attorney-in-fact for health care objects to the 'withholding' of a requested drug."  Therefore, Gahl asserts that "there are no other legitimate interpretations or

23

limitations in the statute's words once they have objected to the withholding which [Gahl] did on numerous occasions."

¶41     We reject Gahl's reading of this statutory language. WISCONSIN STAT. § 155.30(1) merely sets out standard language that must be included on HCPOA forms that are distributed or sold in Wisconsin for use by persons who lack legal counsel. That language serves informative and instructive functions, for example, for purposes of estate planning, to declare a person's preferences for the degree of intervention in the case of a terminal illness, or to "empower another to make these decisions in the event of his or her incompetency, through a health care power of attorney." 4 JAY E. GRENIG, WIS. LEGAL FORMS § 29:5 (2022 ed.). The statute to which Gahl refers does not define "health care decision[s]" in terms of the right to demand any health care that the patient desires. Under Wisconsin law, a "[h]ealth care decision" is an "informed decision in the exercise of the right to accept, maintain, discontinue or refuse health care." WIS. STAT. § 155.01(5).

¶42     Nothing in the plain language of the statute or the definition of a "health care decision" requires a health care provider to act on the HCPOA's requests or demands for specific treatment that is below the standard of care.[24] *See* WIS. STAT. §§ 155.01(5), 155.30(1). We decline to interpret the standard language in the HCPOA form to create such a right. In addition, consistent with the statutory language, the actual HCPOA form provided in the record only gives Gahl the authority to "accept, maintain, discontinue, or refuse any care, treatment, service, or procedure." No language in the HCPOA form (1) confers upon Gahl the authority to demand a specific course of medical treatment for the patient that falls below the

---

[24] The language required to be included in the HCPOA form states only that "necessary health care" may not be withheld. WIS. STAT. § 155.30(1). Gahl fails to explain how a treatment the provider determines is below the standard of care could qualify as "necessary."

standard of care; (2) requires a health care provider to provide it; or (3) empowers a court to compel the patient's physicians or the hospital to provide a desired course of treatment below the standard of care. We decline Gahl's request to create new law.

### B. Breach of Contractual Duty based on Hippocratic Oath

¶43    Gahl's second argument is that Aurora breached its contractual duty of "good faith and fair dealing" to the patient "by withholding a safe, effective drug that would have helped him to recover in the earlier stages of Covid-19 and may still have some value in the later stages of lung disease." Gahl raised this issue in his request for declaratory judgment in his petition, but he never mentioned or argued it before the circuit court. Before this court, Gahl resurrects this argument, stating that the patient "has an ongoing contractual relationship with the Aurora Medical Center and its doctors," which "at the very least" carried "implicit promises to 'Do No Harm' and that the hospital and its staff would try to help him."

¶44    To find a breach of a contractual duty, we need either an express or an implied contract. Gahl has not identified any express contract, and none is present in the record. An implied contract requires evidence that the parties had a meeting of the minds, or a mutual intention to contract with each other. *See **Kramer v. City of Hayward***, 57 Wis. 2d 302, 306-07, 203 N.W.2d 871 (1973) ("A contract implied in fact may arise from an agreement circumstantially proved, but even an implied contract must arise under circumstances which show a mutual intention to contract. The minds of the parties must meet on the same thing."). Gahl points to no evidence in the record from which we could deduce the existence, nature, or

terms of any implied contract between Aurora and the patient that Aurora will provide a treatment that does not meet the standard of care.[25]

¶45    Instead, Gahl posits that the Hippocratic Oath created an implied contract. According to Stedman's Medical Dictionary, the Hippocratic Oath is "[a]n oath taken by physicians usually on receiving the doctoral degree, whereby they promise to observe ethical principles in the practice of medicine." *Hippocratic Oath*, STEDMAN'S MEDICAL DICTIONARY (28th ed. 2006). No Wisconsin court has held that the Hippocratic Oath creates an implied contract between a doctor and a patient in this context,[26] and Gahl points to no legal authority for this argument. Usually we do not consider arguments that are unsupported by references to legal authority. *See* **State v. Pettit**, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992). However, in this case, we write further to emphasize the absurdity of Gahl's argument. First, we do not know that this patient's healthcare providers even took the oath. Most medical school graduates "appear to regard the exercise as a mere formality or a bow to tradition rather than a legally or morally binding covenant." *Hippocratic Oath*, STEDMAN'S MEDICAL DICTIONARY (28th ed. 2006). Second, if

---

[25] Courts in other jurisdictions that have recognized the existence of an implied contract between health care providers and patients have been careful to note that the provider's implied contractual obligation is to provide care that meets the applicable standard of care. *See, e.g.,* **Texas Health Huguley, Inc. v. Jones**, 637 S.W.3d 202, 220 (Tex. App. 2021). A breach of the obligation could subject the provider to liability for malpractice.

[26] Our review of Wisconsin law regarding the Hippocratic Oath indicates that it has generally been limited to discussions involving doctor-patient confidentiality. Even in the context of doctor-patient confidentiality, our supreme court has held that the oath did not create a binding obligation in all circumstances. For example, the oath "does not prohibit a plaintiff's treating physicians from communicating ex parte with each other or with defense counsel regarding nonconfidential information." **Steinberg v. Jensen**, 194 Wis. 2d 439, 465-66, 534 N.W.2d 361 (1995).

Gahl wants us to find a contract based on the Hippocratic Oath, he has not provided us with any version of the oath that supports what he says.[27]

¶46    In conclusion, Gahl has not identified any authority to support an express or implied contractual obligation by healthcare providers to provide care that the patient demands, and which is below the standard of care, based on some

---

[27] One version, cited below, does not even contain the language that he posits:

> I swear by Apollo the Physician, Asclepius, Hygeia, Panaceia, and all the gods and goddesses, making them my witnesses, that I will fulfill this oath and this covenant according to my ability and judgment:  To regard him who teaches me the art of medicine as equal to my parents; to share my life with him and, if he is in need, my sustenance; to regard his children as my brothers and to teach them this art, if they wish to learn it, without fee or covenant; to give instruction, written, oral, and practical, to my sons and the sons of my teacher, as well as to any students who have signed a covenant and sworn an oath according to the canons of our profession, but to no others.  I will apply therapeutic measures for the benefit of the sick according to my ability and judgment, and will abstain from harm and wrongdoing.  I will not give a lethal drug to anyone requesting it, nor will I recommend the use of such.  Likewise I will not give a woman an abortive drug.  I will live my life and practice my art in purity and in holiness.  I will not perform surgery, even on sufferers from stone, but will not interfere with those who engage in such work.  Whatever houses I enter, I will do so for the benefit of the sick, refraining from all intentional wrongdoing and misconduct, particularly from sexual involvement with persons of either gender, whether free or slaves.  I will not divulge anything of a private nature regarding people's personal lives that I see or hear, whether in the course of my professional activities or not, because I recognize the shamefulness of revealing such information.  If I carry out this oath and do not break it, may I find satisfaction in life and the practice of my profession and may I deserve honor among men forever.  If I violate it and swear falsely, may the opposite be my lot.

*Hippocratic Oath*, STEDMAN'S MEDICAL DICTIONARY (28th ed. 2006).

language attributed to the Hippocratic Oath.[28]  Again, Gahl has failed to identify a contract claim upon which he could obtain a declaratory judgment.  Thus, there is no viable claim upon which to grant injunctive relief.

### C.      Circuit Court's Inherent Authority

¶47     Finally, Gahl asserts that the circuit court has "equitable authority" to force Aurora to give the proposed treatment.  We construe Gahl's request for the court to exercise "equitable" power as invoking the court's "inherent" authority. *See* ***Breier v. E.C.***, 130 Wis. 2d 376, 388, 387 N.W.2d 72 (1986) ("The issue of equitable authority is a variant of the inherent authority doctrine.  It permits a court to grant equitable remedies to private litigants in situations in which there is no explicit statutory authority or in which the available legal remedy is inadequate to do complete justice.").

¶48     While "circuit courts have 'inherent, implied and incidental powers,'" the "powers are those that are necessary to enable courts to accomplish their constitutionally and legislatively mandated functions." ***State v. Henley***, 2010 WI 97, ¶73, 328 Wis. 2d 544, 787 N.W.2d 350 (citation omitted).  These powers have been exercised in three areas: "(1) to guard against actions that would impair the powers or efficacy of the courts or judicial system; (2) to regulate the bench and bar; and (3) to ensure the efficient and effective functioning of the court, and to fairly administer justice." ***Id.***  In other words, "inherent powers" are those powers

---

[28] Within his contract argument, Gahl makes a number of unsupported assertions.  For example, he asserts that Aurora breached an implied duty when it adopted a protocol prohibiting the use of the proposed treatment but then administering other medications to its patients that he suggests "further endangers each of these patients."  Gahl points to nothing in the record suggesting that Aurora had an implied duty not to adopt the protocol.

"needed to 'maintain [the courts'] dignity, transact their business, [and] accomplish the purposes of their existence.'" *Id.* (alterations in original; citation omitted).

¶49    Nothing in this case involves a court's inherent powers.  The power to compel a health care provider to provide a requested treatment, especially one that the provider deems below the standard of care, does not clearly fall within any of the three areas in which inherent authority has been exercised.  It is not necessary to prevent impairment of the court's power or efficacy.  It is not related to the regulation of the bench or bar.  And it is not necessary to ensure that our courts function efficiently and effectively.

¶50    Further, while we agree that circuit courts have "authority to grant equitable relief, even in the absence of a statutory right," that relief "must be in response to the invasion of legally protected rights ….   Obviously, not every perceived injustice is actionable." *Breier*, 130 Wis. 2d at 388-89.  Again, Gahl has not identified any source of Wisconsin law that gives him or the patient a right to compel a health care professional to administer a course of treatment contrary to that medical professional's judgment.

### D.    *Substantive Due Process*

¶51    Though not developed in Gahl's brief, any contention that the patient has a substantive due process right to receive a particular type of treatment at a private facility is not supported in law.  Courts in Wisconsin and other jurisdictions have concluded that a patient does not have a substantive due process right to receive a particular medical treatment.  The right to substantive due process derives from the Fourteenth Amendment to the United States Constitution.  U.S. CONST. amend. XIV, § 1.  Thus, without state action, there is no violation of substantive due process. Substantive due process protects against governmental actions that are arbitrary and

wrong "regardless of the fairness of the procedures used to implement them." ***Penterman v. Wisconsin Elec. Power Co.***, 211 Wis. 2d 458, 480, 565 N.W.2d 521 (1997) (citations omitted). In this case, Gahl cannot overcome the threshold issue of state action. Aurora is a private organization.

¶52 Even in cases meeting the threshold determination of state action, courts in this and other jurisdictions have not recognized a substantive due process right to receive whatever treatment a patient demands. *See, e.g.*, ***Disability Rights Wis. v. University of Wis. Hosp. & Clinics***, No. 2014AP135, unpublished slip op. ¶¶1, 3 (WI App Dec. 11, 2014) (finding no violation of substantive due process rights of patients treated at a publicly funded hospital where "doctors did not provide potentially life-extending medical treatments to two developmentally disabled patients")[29]; ***Abigail All. for Better Access to Developmental Drugs v. von Eschenbach***, 495 F.3d 695, 697 (D.C. Cir. 2007) (en banc) (finding terminally ill patients do not have a fundamental due process right to access experimental drugs); ***Mitchell v. Clayton***, 995 F.2d 772, 775-76 (7th Cir. 1993) (collecting cases and noting that "most federal courts have held that a patient does not have a constitutional right to obtain a particular type of treatment or to obtain treatment from a particular provider if the government has reasonably prohibited that type of treatment or provider"); ***Rutherford v. United States***, 616 F.2d 455, 457 (10th Cir. 1980) ("[T]he decision by the patient whether to have a treatment or not is a protected right, but his [or her] selection of a particular treatment, or at least a medication, is within the area of governmental interest in protecting public health.").

---

[29] Unpublished opinions authored by a member of a three-judge panel and issued on or after July 1, 2009, may be cited for their persuasive value. *See* WIS. STAT. RULE 809.23(3)(b).

### E. Decisions of courts in other jurisdictions are consistent with our decision

¶53    At the hearing, Gahl's attorney argued that he has been successful in persuading other courts to adopt his views about compelling private medical facilities to provide the proposed treatment, noting that he could "provide a dozen or more court orders from judges all around this country who have agreed *in terms of equity* to provide the patient" with the proposed treatment. (Emphasis added.) No such orders appear in the record. Gahl's attorney provided no published opinions, did not provide an affidavit, and did not testify under oath.[30]

---

[30] We conducted our own research to determine whether we could find any of the orders to which Gahl's attorney alluded. We could find none in any publicly accessible source.

In his response brief, Gahl referenced two decisions from courts in Illinois. Those decisions were not presented to the circuit court, especially considering that one of the orders was signed after the court entered its order in this case. We note that neither decision is precedential here. Moreover, we question whether those cases even represent current Illinois law. On December 29, 2021, the Illinois Appellate Court ruled against the position that Gahl advocates. *See Abbinanti v. Presence Cent. & Suburban Hosps. Network*, 2021 IL App (2d) 210763, ¶¶18-23 (affirming denial of request for injunctive relief ordering hospital to administer the proposed treatment to critically ill COVID-19 patients).

¶54     Courts in eight different states that have considered this issue have reached the same conclusion that we do here:  that a court lacks the legal authority to force a private medical facility to provide treatment that it concludes is below the standard of care.[31]  *See Texas Health Huguley, Inc. v. Jones*, 637 S.W.3d 202, 214 (Tex. App. 2021) ("The judiciary is called upon to serve in black robes, not white coats.  And it must be vigilant to stay in its lane and remember its role.  Even if we disagree with a hospital's decision, we cannot interfere with its lawful exercise of discretion without a valid legal basis."); *DeMarco v. Christiana Care Health Servs. Inc.*, 263 A.3d 423, 426 (Del. Ch. 2021); *Abbinanti v. Presence Cent. & Suburban Hosps. Network*, 2021 IL App (2d) 210763, ¶¶18-23 ("Every published appellate decision involving a request by a patient to force a hospital or doctor to administer Ivermectin to treat COVID-19 has rejected that request."); *Frey v. Trinity Health-Michigan*, No. 359446, 2021 Mich. App. LEXIS 6988, at *13 (Mich. Ct. App. Dec. 10, 2021) ("Patients, even gravely ill ones, do not have a right to a particular treatment, and medical providers' duty to treat is coterminous with their standard of

---

        The only publicly available case that we found in which a trial court agreed with Gahl's theory was in Ohio, where the Court of Common Pleas of Ohio ordered the defendant hospital to administer Ivermectin on August 23, 2021. *Smith v. West Chester Hosp., LLC*, No. CV 2021 08 1206, 2021 WL 4316593, at *1 (Ohio C.P. Aug. 23, 2021).  The plaintiff's attorney was the same attorney as in this case.  Shortly after issuing its decision, the court modified its order on September 3, 2021, to allow the hospital "to cease administration of Ivermectin, at its discretion, if Mr. Smith's treating physician(s) at West Chester Hospital determine that Mr. Smith is experiencing any life threatening side effects due to the administration of Ivermectin." *Smith v. West Chester Hosp., LLC*, No. CV 2021 08 1206, 2021 WL 4316594, at *1 (Ohio C.P. Sep. 3, 2021).  However, three days later, on September 6, 2021, the court denied the injunction, holding that an injunction should not be granted "to force a hospital to honor the prescription of a doctor that has not seen a patient and has no privileges at said hospital thus forcing the hospital to give ivermectin to a patient when the hospital's doctors, the FDA, CDC, and the AMA do not believe ivermectin should be a recommended way to treat COVID-19." *Smith v. West Chester Hosp., LLC*, No. CV 2021 08 1206, 2021 Ohio Misc. LEXIS 103, at *3, *7-12 (Ohio C.P. Sept. 6, 2021).  Despite having lost that case, Gahl's attorney did not inform the circuit court in this case about this reversal.

[31] We reach our decision based on Wisconsin law, but look to these other courts for their persuasive value.

care. This court will wield its equitable powers only to enforce a right or duty; in their absence, relief is not available." (citation omitted)); ***D.J.C. v. Staten Island Univ. Hosp.-Northwell Health***, 157 N.Y.S.3d 667 (N.Y. App. Div. 2021); ***Pisano v. Mayo Clinic Fla.***, 333 So. 3d 782 (Fla. Dist. Ct. App. 2022) ("The question here is not about whether Mr. Pisano (or his proxies) may 'choose life'; it is whether Mr. Pisano has identified a legal right to compel Mayo Clinic and its physicians to administer a treatment they do not wish to provide. The answer is no." (footnote omitted)); *see also* ***Marik v. Sentara Healthcare***, No. CL21-13852, 2021 Va. Cir. LEXIS 219, at *10-12 (Va. Cir. Ct. Nov. 23, 2021); ***Smith v. West Chester Hosp., LLC***, No. CV 2021 08 1206, 2021 Ohio Misc. LEXIS 103 (Ohio C.P. Sept. 6, 2021).

¶55     We too must conclude that Gahl has not identified any Wisconsin law that gives rise to a right upon which he seeks to obtain a declaratory judgment in this case.[32]   The circuit court erroneously exercised its discretion by granting temporary injunctive relief on the basis of a pleading that fails to state a viable legal claim, and consequently, a claim upon which Gahl could show a reasonable likelihood of success. Although our discussion of the likelihood of success factor is sufficient to support our decision, for the sake of completeness we discuss two of the other preliminary injunction factors below because a review of these factors demonstrates the consequences of ordering injunctive relief when there is no underlying viable claim.

### III.     Likelihood of Irreparable Harm

---

[32]  Even if Gahl had identified other potential sources of patient "rights," such as informed consent, he has failed to show that any other source provides a legal right to compel a provider to administer a treatment that is contrary to that provider's medical judgment, i.e., below the standard of care.

¶56   To obtain temporary injunctive relief, Gahl must also show he is likely to suffer irreparable harm if a temporary injunction is not issued. *See Milwaukee Deputy Sheriffs' Ass'n*, 2016 WI App 56, ¶20. The circuit court made no findings as to this requirement, and our review of the facts suggests that Gahl cannot show irreparable harm. Gahl argues that irreparable harm would befall the patient due to his health condition. Yet, by the time of the hearing on October 13, the patient had tested negative for COVID-19 and was reported to be improving.

¶57   On the other side of the ledger, Aurora raised several concerns about the likelihood of the mandatory injunction causing irreparable harm not only to the patient but to Aurora's own licensing status and that of its doctors when there is no viable legal claim, and in fact, the order requires Aurora to operate outside the boundaries of the law—below the standard of care. Regarding the patient, Aurora's affidavits show that the treatment providers were concerned that the proposed treatment itself could cause harm to the patient, including damaging his heart, liver, and kidney, and increasing the risk of stroke, hypotension, ataxia, seizures, coma, and even death. Aurora also raised concerns about the logistics of administering the proposed treatment and providing long term support after the proposed treatment was administered.[33]

¶58   Aurora also raised concerns that it could suffer irreparable harm in the form of exposure to civil liability for acting, albeit under court order, below the standard of care. Again, the circuit court did not make any findings about this issue other than to authorize Aurora to draft, and Gahl to sign, a release of liability. The court order did not absolve Aurora of liability or resolve how the parties were to

---

[33] The court acknowledged Aurora's concerns about logistical issues, but it did not resolve them.

address the scope of the release, much less the implications when other patients demand treatments that health care providers determine are below the standard of care. *See, e.g.*, ***Frey***, No. 359446, 2021 Mich. App. LEXIS 6988, at \*13 (Although the plaintiff had offered to sign a release, "the potential harm to defendants is broader than this one case, because a court directive in this matter could open the door for a flood of similar suits from other patients with COVID-19, not to mention other conditions, suing to obtain care that is contrary to hospital policies."). Ultimately, whether a release would shield Aurora and its health care professionals from liability could remain uncertain until decided in future litigation.[34]

¶59    Aurora raised further concerns, which the circuit court failed to address, about Aurora's medical licensing status and those of its doctors and nurses who would be required to violate their duty of care. According to Aurora, it is licensed to provide care under federal regulations governing Medicare, which require a hospital to adhere to minimum standards of care. *See* WIS. STAT. §§ 50.32-50.39. Aurora explains that state regulations also require doctors to adhere to minimum standards of care. *See* WIS. STAT. § 448.02; WIS. ADMIN. CODE §§ Med 10.01(2), 10.03 (Feb. 2022). While Gahl suggests that a court order *could* insulate the health care providers from the consequences of non-compliance with those regulations, he fails to spell out exactly how this would play out under all circumstances, much less when considering a patient's evolving condition under the care of providers who presumably have no training or experience in administering

---

[34] That the parties and the circuit court discussed a release of liability is further evidence that Gahl's requested relief would have forced Aurora to act outside the boundaries of the law and that his request was not grounded in any legal authority. In other words, the release of liability would be necessary because the court was ordering Aurora to, against its professional judgment, commit medical negligence. We are hard-pressed to envision other areas of the law in which a court could compel a private business and individuals to affirmatively act outside the boundaries of the law such that it could subject them to legal liability.

the proposed treatment. Nor does Gahl address how an order would protect Aurora in the future involving other patients presenting similar demands under different circumstances.

### IV. Preservation of the Status Quo

¶60 Finally, the third criterion for temporary injunctive relief pertains to maintaining the status quo between the parties until the litigation ends. *Milwaukee Deputy Sheriffs' Ass'n*, 370 Wis. 2d 644, ¶20. As noted above, usually "[t]he purpose of a temporary injunction or restraining order is to maintain the status quo and not to change the position of the parties or compel the doing of acts which constitute all or part of the ultimate relief sought." 8 JAY E. GRENIG, WIS. PLEADING AND PRAC. FORMS § 71:31 (5th ed. 2021); *see also Codept, Inc. v. More-Way N. Corp.*, 23 Wis. 2d 165, 173, 127 N.W.2d 29 (1964). Here, however, the circuit court's order changed the status quo by ordering Aurora to begin providing the proposed treatment to the patient. "[I]njunctions are not to be issued lightly, but only where necessary to preserve the status quo of the parties and where there is irreparable injury." *Pure Milk Prods. Coop. v. National Farmers Org.*, 64 Wis. 2d 241, 251, 219 N.W.2d 564 (1974) (footnote omitted). This is especially so for "mandatory" injunctions like the one Gahl sought, which seek to "compel[] the performance of some affirmative action." *See Carpenter Baking Co. v. Bakery Sales Drivers Local Union*, 237 Wis. 24, 31, 296 N.W. 118 (1941); *Gimbel Bros., Inc. v. Milwaukee Boston Store*, 161 Wis. 489, 496, 154 N.W. 998 (1915) ("[T]he power to issue mandatory injunctions … is sparingly used.").

¶61 The circuit court did not address this factor directly, but it is of paramount importance given the concerns Aurora provided to the court and the affirmative relief ordered. The status quo before the litigation was that Aurora was

able to exercise its medical judgment as to patients in the hospital within the bounds of its standard of care. The court's order clearly exceeded the limited purpose of a mandatory injunction because it changed the position of the parties and compelled the acts which constituted all or part of the ultimate relief sought—requiring Aurora to operate outside the boundaries of the law—below the standard of care.

**CONCLUSION**

¶62    In sum, the circuit court erroneously exercised its discretion in granting Gahl's requested relief.  The court failed to identify any viable claim upon which the temporary injunctive relief was granted, and as such, Gahl did not show a reasonable likelihood of success on the merits.  While the lack of a viable claim is dispositive in and of itself, the court also failed to explain how granting Gahl's requested relief was necessary to avoid irreparable harm—given that there was no legal authority to compel Aurora to provide treatment below the standard of care.  Finally, the court's order neither preserved nor restored the status quo between the parties, but instead altered the status quo and granted much, if not all, of the relief Gahl ultimately seeks in this case.

¶63    Recognizing that he has failed to identify any legal basis for the circuit court's action, Gahl urges us to ignore the law based on his assertions that the treatment protocols for COVID-19 are wrong, as we discussed above.  These criticisms do not empower us to order a private health care provider to administer a proposed treatment that does not fall within its standard of care when there is no legal authority upon which to do so.  Our role is to interpret and apply the law as written.  We are bound by the law, and the law in this case does not provide a basis for judicial intervention.

¶64    For the foregoing reasons, we hold that the circuit court had no legal authority to compel Aurora, a private healthcare provider, to provide care that is below its standard of care.  We further hold that the court had no legal authority to compel Aurora to credential an outside provider to provide care that is below the standard of care.  Accordingly, we reverse the circuit court's order granting Gahl's petition for a temporary injunction.

38

*By the Court.*—Order reversed.

¶65    GROGAN, J. (*dissenting*).  The emergence of COVID-19—a novel and new virus—has profoundly impacted the lives of ordinary citizens worldwide over the past two years as we have collectively sought to navigate the ever-evolving COVID-19 landscape of new variants, new symptoms, and new medical treatments. While the issues raised in this matter come to us within that context, in deciding this case, it is essential that this court stay focused on the task at hand—reviewing the circuit court's decision to determine whether it followed the law in light of the pertinent facts and reached a reasonable determination in doing so.  Contrary to what the parties may suggest, we are not tasked with determining the efficacy or effectiveness of any specific drug or treatment, and we are likewise not tasked with determining whether the courts can broadly weigh in on the appropriateness of medical treatment.  Further, we are not tasked with making decisions based on personal beliefs and preferences, and we are not tasked with making medical decisions.  Rather, our job in this appeal is to decide the specific *legal question* identified above within the context of *this specific case*.  As in every case this court decides, we are bound by the standards of appellate review, the law, and the record.

¶66    The specific legal question presented is:  Whether the circuit court, after reviewing the filings, hearing arguments, and considering the evidence presented, erroneously exercised its discretion in entering an order granting the requested temporary injunctive relief.[1]  Because I conclude the circuit court did not

---

[1] Although Aurora wants to frame the issue differently, the circuit court did not *declare* a legal right or enter a *judgment*.  Our review arises from the circuit court's *order* granting temporary injunctive relief.  Accordingly, our review is limited to determining whether the circuit court's order of injunctive relief was proper.

erroneously exercise its discretion, I would affirm the circuit court's order. Accordingly, I dissent.

## I

¶67 John J. Zingsheim is a sixty-year-old man currently in Aurora Summit's Intensive Care Unit (ICU). Zingsheim was admitted to the ICU immediately upon his transfer from Aurora Hartford where he was receiving treatment for COVID-19. Zingsheim arrived at Aurora Summit on September 19, 2021, and was placed on a ventilator on October 3, 2021. Allen Gahl, the adult nephew and power of attorney for Zingsheim, saw his uncle's condition continue to decline as the course of treatment Aurora pursued failed to work. In an attempt to reverse the decline, Gahl obtained a prescription for ivermectin for Zingsheim from Dr. Edward Hagen, M.D., a physician who is licensed in Wisconsin but who is not affiliated with Aurora, and requested that Aurora administer ivermectin to Zingsheim. Aurora refused.

¶68 Gahl sought injunctive relief in the Waukesha County Circuit Court, indicating he would "sign a release, pursuant to informed consent principles, thereby releasing the Hospital[,] its agents, assigns, and any third parties acting on its behalf, and any doctors acting on behalf of the Hospital, from any and all liability in administering the Treatment to Mr. Zingsheim."

¶69 The circuit court held a hearing on October 12, 2021, and heard arguments, reviewed the filings, and ordered supplemental materials be filed updating the court as to Zingsheim's condition and current treatment. Later the same day, the court ordered Aurora to administer the ivermectin prescribed by Dr. Hagen to Zingsheim. Aurora did not administer the ivermectin and instead filed a petition for leave to appeal a nonfinal order, sought relief pending appeal in the

circuit court, and filed a letter with the circuit court seeking clarification of its October 12 order.[2]

¶70 On October 13, 2021, the circuit court held a second hearing and addressed Aurora's concerns. The circuit court orally modified its previous order, and instead of requiring *Aurora* to administer the ivermectin, the circuit court clarified it was ordering Aurora to allow a physician identified by Gahl to be credentialed by Aurora and given permission to go to Aurora and administer the ivermectin to Zingsheim.[3] Before a written order to that effect could be produced, this court granted Aurora's petition to appeal the nonfinal order the circuit court had entered on October 12. This court granted the order without a response from Gahl. It also decided sua sponte—that is, without a request from Aurora asking it to do so—to stay the circuit court order and all circuit court proceedings. Thus, despite the circuit court's order allowing Zingsheim to receive ivermectin, the medication could not be given because of this court's stay order.

¶71 On October 20, 2021, Gahl filed an emergency petition to bypass the court of appeals. In a 4-3 decision, the Wisconsin Supreme Court denied that petition on October 25, 2021, and the circuit court proceedings remained stayed

---

[2] Specifically, Aurora asserted the following:

> The content of the signed Order is extremely problematic. I am not aware of any orders written by Dr. Hagen, but am aware of a prescription written by Dr. Hagen for [i]vermectin 66mg to be taken once daily. The prescription does not indicate from where the [i]vermectin is to be obtained or how the tablets are to be administered to a patient who is intubated and sedated. Finally, the Order provides that Aurora is to administer [i]vermectin "as further ordered by Mr. Gahl." Mr. Gahl is not a healthcare provider.

[3] Aurora's attorney reported that Zingsheim had now tested negative for COVID-19, but Gahl's attorney advised that the ivermectin was "not solely for the issue of COVID. It's for COVID and the damages that come about as a result of COVID."

pursuant to this court's order. Justice Rebecca Grassl Bradley dissented, joined by Chief Justice Annette Kingsland Ziegler and Justice Patience Drake Roggensack, and noted:

> In this case, the family of John Zingsheim, who is on a ventilator and in a drug-induced coma battling COVID-19, asked the circuit court to order potentially life-saving treatment Mr. Zingsheim's doctor prescribed—[i]vermectin—but Aurora Medical Center-Summit declined to administer it. After reviewing evidence, hearing testimony, and considering arguments, the circuit court ordered Aurora to administer the treatment. While Aurora's interlocutory appeal was pending, the parties agreed that Aurora would grant temporary privileges to a doctor—chosen by the family—to administer the medication, while the family would release Aurora from any liability arising from it. The circuit court modified its order to reflect the agreement. The court of appeals stayed the circuit court order and proceedings, without knowledge of the substance of the modification, *even though Aurora did not ask the court of appeals for such relief.*

¶72 This case was placed on this court's expedited calendar and briefing was completed on January 12, 2022.[4] Additional facts will be developed as necessary.

## II

¶73 A temporary injunction is "not to be issued lightly" and should be issued only where the cause is "substantial." ***Werner v. A. L. Grootemaat & Sons, Inc.***, 80 Wis. 2d 513, 520, 259 N.W.2d 310 (1977). To grant a request for injunctive relief, the circuit court must find that: (1) the person requesting relief is "likely to suffer irreparable harm if a temporary injunction is not issued"; (2) there is "no other

---

[4] This appeal was initiated on October 12, 2021. On October 25, 2021, our supreme court entered an order indicating this court would need to decide the appeal. Briefing took months (in part due to a delay by this court in deciding a briefing extension motion), but was complete on January 12, 2022. This case has been pending for 225 days since inception, 212 days from the supreme court's order, and was not released until 133 days from the time briefing was complete.

adequate remedy at law"; (3) "a temporary injunction is necessary to preserve the status quo"; and (4) the requestor "has a reasonable probability of success on the merits." *Milwaukee Deputy Sheriffs' Ass'n v. Milwaukee County*, 2016 WI App 56, ¶20, 370 Wis. 2d 644, 883 N.W.2d 154. "Injunctive relief is to be tailored to the necessities of the particular case." *State v. Seigel*, 163 Wis. 2d 871, 890, 472 N.W.2d 584 (Ct. App. 1991). "An injunction may be no more broad than is 'equitably necessary.'" *City of Milwaukee v. Burnette*, 2001 WI App 258, ¶10, 248 Wis. 2d 820, 637 N.W.2d 447 (citation omitted).

¶74 "Whether to grant or deny an injunction is vested in the trial court's reasoned discretion." *Diamondback Funding, LLC v. Chili's of Wis., Inc.*, 2004 WI App 161, ¶6, 276 Wis. 2d 81, 687 N.W.2d 89. The test on appeal "is *not whether the appellate court would grant the injunction* but whether there was an [erroneous exercise] of discretion on the part of the trial court." *Wisconsin Ass'n of Food Dealers v. City of Madison*, 97 Wis. 2d 426, 429, 293 N.W.2d 540 (1980) (emphasis added); *see also Hoffmann v. Wisconsin Elec. Power Co.*, 2003 WI 64, ¶10, 262 Wis. 2d 264, 664 N.W.2d 55 (review on appeal is limited to whether the circuit court erroneously exercised its discretion in granting injunctive relief). "A discretionary determination will be sustained where it is demonstrably made and based upon the facts appearing in the record and in reliance on the appropriate and applicable law." *Diamondback Funding, LLC*, 276 Wis. 2d 81, ¶6 (citation omitted).

5

¶75    Aurora's primary argument is that a circuit court cannot order it to provide treatment it believes falls below the standard of care.[5]   Aurora's argument is unavailing, however, because Aurora fails to meaningfully connect that argument—or any of the other arguments it raises—to the *legal* question at issue here:   Whether the circuit court erroneously exercised its discretion in granting the injunction.  *See School Dist. of Slinger v. Wisconsin Interscholastic Athletic Ass'n*, 210 Wis. 2d 365, 371, 563 N.W.2d 585 (Ct. App. 1997) ("The merits of the case are not before this court in the instant appeal; the only question is whether the circuit court erroneously exercised its discretion.").

¶76    Having reviewed the record, which I describe in detail below, I conclude the circuit court did not erroneously exercise its discretion.   Here, the circuit court held hearings regarding Gahl's motion for injunctive relief on October 12 and 13, 2021.  At the outset of the October 12 hearing, the circuit court properly identified the relevant injunction statute.  The circuit court went on to explain that despite the apparent urgency of Gahl's motion, which had been filed five days prior to the hearing, it had not previously acted on the motion because Gahl's supporting documents had not come through with the initial submission, and it was Gahl's "obligation to put [his] materials out there so the Court can make an intelligent decision[.]"  It is therefore clear that the circuit court, from the outset, recognized not only the importance of developing a detailed record prior to taking action on

---

        [5]  Aurora asserts the following arguments on appeal:  (1) a court does not have the power to compel a health care provider to render medical treatment it believes falls below the standard of care; (2) "no patient has a recognized right to demand and receive specific medical treatment"; (3) courts should not interfere with physicians' medical decisions because it might trigger sanctions by the Wisconsin Medical Examining Board for "unprofessional conduct"; (4) courts should not intrude on a hospital's credentialing decisions; and (5) a court's interference with treatment could "adversely impact the delivery of health care in Wisconsin" by moving health care treatment decisions "from the patient's bedside to a judge's bench."

Gahl's request, but also that it was required to base its decision on the applicable facts and law.

¶77 During the October 12 hearing, the parties presented arguments regarding the four injunction factors in the context of this case. The circuit court heard numerous details regarding the decline in Zingsheim's condition, treatments Aurora had administered, how and why Gahl obtained a prescription for ivermectin, and Aurora's objection that administering ivermectin would fall below what it believed to be the proper standard of care. Gahl also presented information pertaining to purportedly successful uses of ivermectin in treating COVID-19 patients and pointed out that he had requested administration of ivermectin only after Aurora had exhausted its standard treatment protocol.

¶78 Throughout the October 12 hearing, the circuit court repeatedly questioned the parties to elicit additional information and greater detail. For example, the circuit court asked questions regarding the Food and Drug Administration's (FDA) position regarding ivermectin as a COVID-19 treatment, the extent of Hagen's treatment of Zingsheim and whether Hagen had ever met with Zingsheim or reviewed his medical records, and the nature of the treatment Zingsheim was receiving from Aurora (if any) at the time of the hearing.

¶79 Having heard from the parties, the circuit court specifically identified the factors it was required to consider in ruling on Gahl's request for injunctive relief, stating those factors provide "the basis and the background legally that the Court has to utilize as a framework and in assessing the circumstances of this case." The circuit court acknowledged this matter is "of extremely serious concern and potential consequences" because Zingsheim's medical condition could be described as "dire." In referencing the ivermectin prescription, the circuit court acknowledged

7

it "has no level of medical expertise or experience" and that it was "relying on the record that's been generated here today to make the evaluation and exercise the Court's discretion on the request." At that point, however, the circuit court noted the record was lacking in some respects—for example, there was no assertion from a medical professional regarding Zingsheim's chances for survival with or without the requested treatment, there was nothing in the affidavits from Aurora's physicians identifying the current treatment protocol for Zingsheim, and no medical experts had opined as to the validity of the various ivermectin studies Gahl presented.

¶80    In the absence of such information, the circuit court was reluctant to rule on Gahl's request, particularly given the "polar opposite[]" positions the parties had taken in regard to ivermectin, and it further acknowledged that without such additional information, "it's very difficult … to assess what, in fact, we're dealing with other than relying on anecdotal representations today that [are] otherwise unsupported by competent medical expertise." The circuit court, recognizing "there has to be a legal basis for [it] to make a determination[,]" therefore allowed the parties to submit supplemental information addressing those issues by a deadline later that same day.[6] Specifically, the circuit court informed the parties it "need[ed] evidence … more evidence from the treating doctors as to what is Mr. Zingsheim's current medical situation, what is his prognosis, what -- what is proposed to move forward" and that it wanted "more information to -- to create that connection between this Dr. Hagen prescription and Mr. Zingsheim, because what I'm seeing here is just -- there's a prescription written by somebody who really has very limited

---

[6] The parties welcomed the opportunity to provide the supplemental information and did not object to the circuit court ruling on Gahl's motion without further argument after the supplemental information was provided.

8

information about Mr. Zingsheim." The circuit court also noted that "the consequences of action and nonaction are significant," confirmed it wanted to make a decision that day because it was concerned about "[d]elaying this and putting this out further[,]" and reminded the parties that "[t]his is not a decision that a Court makes based on emotion."

¶81 The record reflects that the parties submitted the requested materials, and the circuit court, having reviewed them, ultimately signed the October 12 order granting the requested injunctive relief. The record further reflects that the following information, at least some of which came from the supplemental filings, was before the circuit court at the time it issued its order:

- An affidavit from Dr. Edward Hagen, a Wisconsin-licensed physician, who averred that: (1) administration of the prescribed ivermectin "gave the patient a realistic chance for improvement while presenting a low risk of side effects[;]" and (2) he has "prescribed [i]vermectin in about 300 other cases with generally favorable results and no serious cases of side effects from the drug."

- The "Declaration of [Dr.] Pierre Kory, M.D.[,]" who is licensed to practice medicine in Wisconsin. According to that Declaration, Dr. Kory is a pulmonary and critical care doctor and is board certified in Internal Medicine, Pulmonary Diseases, and Critical Care, and he was "an attending physician providing critical care medicine, inpatient pulmonary consultation, and outpatient pulmonary consultation services at Mount Sinai Beth Israel Medical Center in New York City" for many years.

- Dr. Kory also served "as the Medical Director of the main medical-surgical Intensive Care Unit called the Trauma and Life Support Center" at the University of Wisconsin.

- Dr. Kory has "worked in numerous 'hot spots' around the country" since the onset of COVID-19, including New York City, South Carolina, and Milwaukee, and he is "considered an expert in the

pathophysiology and management of COVID-19, having published ten increasingly cited papers on the disease and its clinical management."

- Dr. Kory joined with others from "critical care medicine" and "formed the Frontline Covid-19 Critical Care Alliance in March of 2020 with the sole intent of developing the most effective treatment protocols for COVID-19."

- Dr. Kory is "generally considered the foremost expert on ivermectin in the treatment of COVID-19 in the world[,]"[7] and based on his studies of COVID-19, concluded that "ivermectin should be immediately and systematically deployed in the prevention and treatment of COVID-19." (Emphasis omitted.)

- Dr. Kory testified about the efficacy of ivermectin before Congress at a December 8, 2020 Homeland Security Meeting, where he stated that "[i]vermectin is highly safe, widely available, and low cost[,]" that ivermectin is a Nobel Prize winning drug, that to date over twenty clinical studies showed "that ivermectin is effectively a 'miracle drug' against COVID-19[,]" and that "[t]here is now a wealth of studies reporting efficacy of ivermectin."

¶82 After Aurora submitted a letter requesting clarification or modification of the circuit court's order, the circuit court held an additional hearing on October 13. During the October 13 hearing, the circuit court acknowledged its receipt of the supplemental materials it received the day before, heard additional arguments about continuing the order,[8] and described the information from the supplemental materials it relied on in entering its October 12 order. It then orally modified its order to clarify that it was not requiring one of Aurora's physicians to

---

[7] Aurora does not challenge Kory's assertions as to the breadth of his knowledge and expertise.

[8] Aurora filed a motion seeking relief pending appeal and asked the circuit court to stay the proceedings. Although the circuit court did not explicitly rule on the motion, it is readily inferable that it denied the motion given its October 13 oral modification to its October 12 order.

administer the ivermectin, that Gahl was to provide the ivermectin, that it was Gahl's responsibility to identify a physician who was both willing to administer the ivermectin and who Aurora was willing to credential and grant privileges, and that it was not issuing directions to Aurora as to its credentialing process other than it was to credential an acceptable physician to administer the ivermectin "without undue delay." [9]

¶83    Based on the record, it is clear the circuit court's decision was reasoned and based on the record and applicable law. *See **Diamondback Funding, LLC***, 276 Wis. 2d 81, ¶6 (discretionary decisions are to be "'sustained where it is demonstrably made and based upon the facts appearing in the record and in reliance on the appropriate and applicable law.'" (citation omitted)).  Notably, the circuit court described the required injunction factors in detail and explained that those factors provided the framework in which it was required to make its decision.  The circuit court further recognized that Zingsheim's medical condition, which undoubtedly relates to multiple injunction factors, created an urgent, if not dire, situation.  Specifically, Zingsheim was in a precarious medical condition, which unquestionably pertains to maintaining the status quo (life) and irreparable harm (death).  Additionally, given the urgency of Zingsheim's condition and the finality of death, there was no other adequate remedy at law—the circuit court clearly

---

[9] The circuit court requested that counsel prepare a written order setting forth the clarifications; however, prior to the circuit court having an opportunity to sign the revised order, this court accepted Aurora's appeal and issued a stay of all circuit court proceedings.  Because we invited the parties to address the impact of the clarifications/modifications made to the order during the October 13 hearing, it is necessary to consider the circuit court's comments during both hearings to fully address the issue on appeal.  The transcripts from both the October 12 and October 13 hearings are in the record.

recognized that time was of the essence and there simply was no time for Gahl to wait for a noninjunction lawsuit to proceed in its normal course.[10]

¶84    The circuit court did not specifically explain why it concluded Gahl had established a likelihood of success on the merits. What is clear from the record, however, is that the circuit court understood that likelihood of success on the merits was a required factor, that it was honed in on the competing medical opinions presented by Aurora's and Gahl's supporting physicians as to what treatment would or would not be appropriate for Zingsheim under the circumstances, and that the medical information from the parties' various physicians was central to its determination. Based on the information in the record, it was reasonable for the circuit court to conclude Gahl had established a likelihood of success on the merits as to the applicable standard of care or his ability to establish a legal right to choose ivermectin as a course of treatment after Aurora's treatment protocol failed to improve his COVID-19-related condition.

¶85    Despite Aurora's argument to the contrary, the circuit court did not place itself in the shoes of a treating physician or otherwise act as Zingsheim's doctor when it entered the order granting temporary injunctive relief. Rather, it was presented with evidence of Zingsheim's "dire" medical condition, the treatment Zingsheim had received and was currently receiving, and medical opinions from multiple physicians. The circuit court identified the relevant injunction factors, and in concluding Gahl had met his burden, reasonably determined that injunctive relief

---

[10] In addition to lacking another remedy at law, given Zingsheim's condition, a transfer to another hospital or checking out of Aurora against medical advice, which would likely be an option for patients unhappy with a provider's medical treatment, was presumably not an option.

12

was appropriate. It then fashioned a narrow order wherein Zingsheim could receive the requested alternative treatment, which two licensed and presumably reasonable doctors had advised the circuit court would benefit the patient, without involving Aurora physicians at all.[11]

---

[11] The majority's decision is based on incorrect premises. First, it says a court cannot force Aurora to administer treatment. But, that is not what the circuit court's final order does. Rather, the order says *Gahl's physician* can administer the requested treatment to Zingsheim. Contrary to what the majority states, Gahl submitted an affidavit/declaration from physicians who opine that the proper treatment here is different than Aurora's. Gahl also submitted sworn testimony from a senate hearing from an expert on the treatment of COVID-19, indicating a standard of care different than Aurora's. Second, the majority says there is no legal right underlying the injunction. But, as discussed in part III of this dissent, patients have the right to medically viable alternative treatments. Additionally, all people have the right to life. *See* WIS. CONST. art. I, § 1. Even the majority admits that the FDA recognizes a health care provider and patient may decide to use a repurposed drug. Third, although the majority recognizes the long-established objective standard of care, its opinion effectively adopts a subjective standard of care tied to Aurora's beliefs and personal medical judgment, which it then applies in determining that Gahl has no legal right to the treatment sought. By redefining "standard of care" to mean what the treating physician believes it to be, the majority effectively requires all courts going forward to simply accept the health care provider's belief as to the standard of care where a patient seeks an injunction based on a disagreement with the provider's course of action in providing care. That cannot possibly be the case because the health care provider's standard of care might actually be wrong. The majority's new standard may also inadvertently alter current standards used in medical malpractice lawsuits.

Above all, the majority's flawed premises led it to decide issues that we need not—and should not—decide. It decides the standard of care (although it claims it does not), usurping the role of the factfinder. It decides that the treatment requested on behalf of the patient falls below what the majority has declared to be the standard of care, usurping the role of the factfinder. This court, of course, does not decide credibility of witnesses or make factual findings. *See Dickman v. Vollmer*, 2007 WI App 141, ¶14, 303 Wis. 2d 241, 736 N.W.2d 202; *Kovalic v. DEC Int'l*, 186 Wis. 2d 162, 172, 519 N.W.2d 351 (Ct. App. 1994) (this court does not find facts). Additionally, the majority decides that the requested alternative treatment is not medically viable, contrary to both Hagen's affidavit and Kory's declaration. Based on the majority's determination that the requested treatment is not a medically viable alternative, it decides this patient has no legal right. By exceeding this court's role in reviewing the circuit court's final order, the majority decides unnecessary issues and creates new law that is in direct conflict with longstanding Wisconsin law.

¶86 For all of these reasons, I conclude that the circuit court did not erroneously exercise its discretion in granting the requested injunctive relief and would therefore affirm.

**III**

¶87 This appeal requires only that this court determine whether the circuit court erroneously exercised its discretion and does not involve the actual merits of this case. At this juncture, this court cannot and should not be deciding what the proper standard of care[12] is, whether Aurora breached its statutory duty to provide Zingsheim with the information required by the informed consent statute,[13] or any

---

Finally, the majority's opinion is at times misleading. For example, it says the patient was *improving*. But, the circuit court rejected Aurora's lawyer's suggestion to that effect. The circuit court said it could make no conclusions based on Aurora's affidavit about whether the patient was improving. The Aurora physician's affidavit did not say the patient was "*improving*." The majority also discusses numerous cases where courts rejected patients' requests for treatment, but declines to address WIS. STAT. § 450.137 (2019-20), Wisconsin's Right to Try law.

[12] "Standard of care" is generally defined as what a reasonable physician would do in the same or similar circumstances. *See generally* **Phelps v. Physicians Ins. Co. of Wis.**, 2005 WI 85, ¶40, 282 Wis. 2d 69, 698 N.W.2d 643 (citing WIS JI—CIVIL 1023 addressing standards of care for physicians in medical malpractice claims).

[13] WISCONSIN STAT. § 448.30 (2019-20) provides:

> **Informed Consent.** Any physician who treats a patient *shall inform the patient about the availability of reasonable alternate medical modes of treatment* and about the benefits and risks of these treatments. The reasonable physician standard is the standard for informing a patient under this section. *The reasonable physician standard requires disclosure only of information that a reasonable physician in the same or a similar medical specialty would know and disclose under the circumstances.* The physician's duty to inform the patient under this section does not require disclosure of:
>
> **(2)** Detailed technical information that in all probability a patient would not understand.

14

other merits issues the parties raise. These are substantive issues decided by juries (or circuit courts if a jury trial is waived). *See, e.g.*, **Martin v. Richards**, 192 Wis. 2d 156, 181, 531 N.W.2d 70 (1995) (affirming a jury verdict where *the jury* found the physician breached his duty of informed consent, explaining that "[w]hen a reasonable person would want to know about an alternative treatment … the decision is not the doctor's alone to make"); *id.* at 176 ("A physician who proposes to treat a patient or attempt to diagnose a medical problem must make such disclosures as will enable a reasonable person under the circumstances confronting the patient to exercise *the patient's right* to consent to, or to refuse the procedure proposed or *to request an alternative treatment* or method of diagnosis." (emphases added)); **Seifert v. Balink**, 2017 WI 2, ¶59, 372 Wis. 2d 525, 888 N.W.2d 816 (discussing standard of care and recognizing that "[w]hen credible, qualified experts disagree," *the jury* "decide[s] which expert to believe"); **Weborg v. Jenny**, 2012 WI 67, ¶¶1-6, 73, 341 Wis. 2d 668, 816 N.W.2d 191 (affirming a *jury's* verdict finding physicians properly conformed to the standard of care and explaining that a *jury* is not "bound by any one expert's opinion on the standard of care" and that in evaluating "the qualifications and credibility of each expert," a *jury* may "accept

---

**(3)** Risks apparent or known to the patient.

**(4)** Extremely remote possibilities that might falsely or detrimentally alarm the patient.

**(5)** Information in emergencies where failure to provide treatment would be more harmful to the patient than treatment.

**(6)** Information in cases where the patient is incapable of consenting.

**(7)** Information about alternate medical modes of treatment for any condition the physician has not included in his or her diagnosis at the time the physician informs the patient.

(Emphases added.)

one expert's opinion on the standard of care over another's"); ***Bubb v. Brusky***, 2009 WI 91, ¶¶3, 73-74, 78, 321 Wis. 2d 1, 768 N.W.2d 903 (reversing the circuit court's decision removing the informed consent question from the *jury* and concluding "that [Wis. Stat.] § 448.30 requires any physician who treats a patient to inform the patient about the availability of all alternate, viable medical modes of treatment, including diagnosis, as well as the benefits and risks of such treatments"); ***Bubb***, 321 Wis. 2d 1, ¶¶73-74 (there was credible evidence "from which a reasonable *jury* could conclude [the physician] fail[ed] to adequately inform the [patient] of the alternative mode[s] of treatment available[,]" and this "same evidence [had a] bearing on whether a reasonable patient in [that] position would have wanted to know about the reasonable alternative mode of treatment that was available" (emphasis added)).

¶88     To suggest, however, that a circuit court, presented with the evidence that was submitted here—where a patient-physician dispute regarding the proper standard of care or availability of a reasonable viable treatment arises in *real-time*—has no legal authority to issue injunctive relief under these circumstances is simply wrong.  Patients have rights in Wisconsin, including, as material:

- The right "to make their own health care decisions";[14]

- The right to informed consent—where physicians must "disclose what a reasonable person in the patient's position would want to know";[15]

---

[14] ***Martin v. Richards***, 192 Wis. 2d 156, 171, 531 N.W.2d 70 (1995).

[15] ***Martin***, 192 Wis. 2d at 172.

- The right to request and receive medically viable alternative treatments "and have that choice respected by her or his doctor."[16]

*Martin*, 192 Wis. 2d at 171-72; *Schreiber v. Physicians Ins. Co. of Wis.*, 217 Wis. 2d 94, 105, 579 N.W.2d 730 (Ct. App. 1998), *aff'd*, 223 Wis. 2d 417, 588 N.W.2d 26 (1999); WIS. STAT. § 448.30 (2019-20).

¶89 Although Wisconsin law does not afford a patient the right to demand *any* treatment the patient desires, it does recognize a patient's right to request and receive medically viable alternative treatments. *See Schreiber*, 217 Wis. 2d at 105; WIS. STAT. § 448.30 (2019-20). The fact that the circuit court was presented with differing opinions about what treatment is proper for Zingsheim suggests the jury is still "out" as to whether there is only *one* particular and established "standard of care" in treating this novel virus. Time will eventually reveal what the standard of care or reasonable alternative treatment is for people in Zingsheim's position. What is important here is that the circuit court had before it information from two independent physicians (one indicating he was the world's foremost expert on treating COVID-19) who both agreed that a protocol *different* than that which Aurora had administered, without success, would be proper and could be beneficial to Zingsheim.

\* \* \*

¶90 The circuit court here considered the pertinent facts and, based on the competing medical information provided, reached a reasonable determination. It determined based on the information before it that Gahl satisfied the necessary

---

[16] *Schreiber v. Physicians Ins. Co. of Wis.*, 217 Wis. 2d 94, 105, 579 N.W.2d 730 (Ct. App. 1998), *aff'd*, 223 Wis. 2d 417, 588 N.W.2d 26 (1999).

injunction factors, and it fashioned a narrowly-tailored order. Because the circuit court did not erroneously exercise its discretion, I would affirm its order. I dissent.